(No. 22220.—

THE PEOPLE *ex rel.* Joseph B. McDonough, County Collector, Defendant in Error, *vs.* THE MILLS NOVELTY COMPANY, Plaintiff in Error.

*Opinion filed June 15, 1934—Rehearing denied October 3, 1934.*

ADELBERT BROWN, (BRUNDAGE, LANDON & HOLT, MAC-CHESNEY, WHITEFORD & WELLS, ALTHEIMER, MAYER, WOODS & SMITH, McDONALD, PRINGLE & RICHMOND, and STEARNS & JONES, of counsel,) for plaintiff in error.

THOMAS J. COURTNEY, State's Attorney, (HAYDEN N. BELL, ROBERT S. CUSHMAN, JACOB SHAMBERG, WILLIAM P. KEARNEY, and LEON HORNSTEIN, of counsel,) for defendant in error.

Mr. JUSTICE HERRICK delivered the opinion of the court:

The county collector of Cook county applied for judgment and order of sale against the property of the Mills Novelty Company, the plaintiff in error, (hereinafter called the objector,) for certain delinquent taxes assessed for the year 1930 against its property. It filed objections to certain of such taxes levied for the benefit of the county of Cook, the city of Chicago and the Cook County Forest Preserve District. All the objections were overruled and judgment of sale was entered. The record of the proceedings is brought here by the objector for review.

The objector attacks the validity of all additional and increased rates arising from the respective supplemental appropriation ordinances of the county of Cook and city of Chicago adopted pursuant to acts of the legislature passed at the special session held in June, 1930. (Laws of 1930, Special Sess. pp. 2, 6, 8, 21, 29, 52.) The board of county commissioners adopted and passed on December 17, 1929, the regular annual appropriation ordinance for Cook county for the fiscal year 1930 and thereafter passed the levy ordinance and filed the same with the county clerk, which levy, when extended, required a rate for the corporate fund of .25. On July 22, 1930, the board passed an additional and supplemental appropriation ordinance for corporate purposes which increased the tax rate on the corporate fund from .25 to .32.

The city council of the city of Chicago adopted and passed on January 3, 1930, the regular annual appropriation ordinance for the fiscal year 1930 and passed the levy ordinance and filed the same with the county clerk, which, when extended, required rates as follows: $1.07½ for the

corporate fund, .05 for the library fund and .06 for the tubercular sanitarium fund on each $100 of assessed valuation. The fiscal year for the city of Chicago began January 1, 1930, and ended December 31, 1930. Afterwards, on July 29, 1930, the city council passed an additional and supplemental appropriation ordinance for the corporate, library and tubercular sanitarium purposes, and passed an ordinance levying a tax of $1.37, .06 and .075 for the corporate, library and tubercular sanitarium fund purposes on each $100 of assessed valuation. Such extensions were made on such basis. The supplemental appropriations were not occasioned by fire, flood or public calamity.

The power to authorize the levy of taxes by the State and the different political subdivisions thereof is inherent in the sovereign, except in so far as such authority is limited by the constitution. The sovereign speaks through the legislature, and while the legislature may not directly levy a tax, it may grant to the different municipalities the power to levy such tax and at such rates as in its discretion are proper, restrained only by the inhibitions of the constitution. The acts, *supra,* are not curative acts but are enabling acts, which the different municipalities may adopt or not, as by their several administrative bodies may be deemed appropriate to the municipal needs. There is no conflict between the present enabling taxing statutes and those in existence at the time of the passage of such several enabling acts. There is some difference in procedure, and the acts do grant the authority to increase the amount of the taxes theretofore levied by the several tax levies, thereby necessarily increasing the tax rates.

The right of municipalities to make additional tax levies where the necessity arose after the passage of the appropriation ordinance has been recognized by this court. (*People* v. *Day,* 277 Ill. 543; *People* v. *Daemicke,* 278 id. 53.) The increased tax rates were severally authorized by statute, and the provisions of the statute in making the

additional appropriations and tax levy ordinance have been scrupulously observed. The enabling legislation here is a part of a program of that class of laws adopted by the legislature at the special session of 1930 for the purpose of affording emergency relief from the serious financial situation which confronted the municipalities, generally, of the State. That phase of such emergency relief taxation plan by which the city of Chicago was authorized to issue bonds and to levy additional tax funds for the city and board of education after the passage of the annual appropriation ordinance has been held valid. (*People* v. *Chicago, Milwaukee, St. Paul and Pacific Railroad Co.* 354 Ill. 630.) The same legal principles which justified the conclusions reached in that case apply to the case at· bar. The levy of the increased tax rates was legal.

The objector urges that the trial court was in error in holding that any levy in excess of .535 for Cook county was valid. The rate extended was .54. The rate was obtained from the following rates: County corporate fund, .32; county highway fund, .125; bond and interest fund, .089—making a total of .534. The objector claims that the rate is excessive by .005. It arrives at such amount by taking the tax rates as follows: *County corporate fund, .32; county highway fund, .125; bond and interest fund, .09.* It then argues that a .32 rate could not be exceeded for bond and interest requirements and the needs for the county fund under the authority of *People* v. *Hoerr,* 294 Ill. 338, *People* v. *Cleveland, Cincinnati, Chicago and St. Louis Railway Co.* 295 id. 214, and *People* v. *Chicago, Burlington and Quincy Railroad Co.* 295 id. 191. We do not differ from the rules of law stated in those cases but they are not aplicable to the present record. We agree with the objector's contention that the rate of .12½ on every $100 valuation, being fixed by statute for the county highway tax, could not be extended by the county clerk at .13 or in excess of .12½. (*People* v. *Missouri Pacific Railroad Co.* 342 Ill.

226.) The objector's error is in the method of its calculation. The rate for the bond and interest fund is .089 and not .09, as assumed by the objector. The total rate as determined by the addition of the different rates for the several county purposes was .534. The county clerk, assuming to act under the provisions of the statute, (Cahill's Stat. 1931, chap. 120, sec. 128, par. 146; Smith's Stat. 1931, p. 2396;) extended the fraction of a cent as .01, thereby adopting the rate of .54. The county clerk did not undertake to advance the fraction of a cent to .01 as to any of the several items of the county tax, but the increase was made after the addition of the several rates for the county as a taxing body. Such action on the part of the county clerk was warranted by the statute. (*People* v. *Chicago, Lake Shore and Eastern Railway Co.* 270 Ill. 477.) The county court did not err in holding that the extension of the tax rate of .54 for county purposes was legal.

It is urged by the objector that the trial court erred in holding that a levy made for an appropriation of $7,035,-927.61 to "liquidate liabilities" was legal. It was stipulated that the appropriation bills, to satisfy the needs of which tax levy ordinances were passed, included a series of items aggregating $7,035,927.61, containing the notation "to liquidate liabilities;" "for the payment of bills and invoices against Cook county outstanding and unpaid November 30, 1929, audited and allowed by the board of commissioners, corporate appropriations therefor having been exhausted, as follows:" etc. The corporate fund balance sheet of Cook county as of November 30, 1929, showed various items in detail which it is not necessary to set forth here. It was stipulated that the total appropriated needs for the fiscal year 1930 were not reduced by reason of said assets. The objections to this item of tax are divided into two subdivisions: (1) The tax-payers for 1930 are not liable for the operating deficits of government for the year

1929; and (2) these sums having been extended in excess of appropriations for the prior year are illegal and void.

The practice of re-appropriating for accumulated deficits of previous years is not a sound practice and will not be encouraged by this court. Such practice might lead eventually to a budget composed principally of re-appropriations for accumulated unliquidated obligations, with the result that little, if anything, would be left of the taxes raised for the meeting of current governmental operating expenses. However, in this case the record is barren of deficits occurring in the year 1929. The only showing made is that the deficits existed at the close of the prior fiscal year. For what length of time the several items which go to make up the total of the unliquidated liabilities existed is not disclosed. If the proof showed that there were solvent uncollected credits from taxes sufficient to meet such unliquidated liabilities we would not hesitate to sustain this objection, but in the absence of proof to the contrary we must assume that the administrative bodies have acted legally and not from ulterior motives. This is a proper presumption, and is such as must be overcome by competent evidence. There is nothing in the record to show that the liabilities unpaid are not legal liabilities incurred in the ordinary course in the exercise of its corporate functions by the county. It is the duty of the board of commissioners to maintain the credit of the municipality and to adopt such methods as are proper and legal to meet the indebtedness of the county in so far as it may be attained. (*Gates* v. *Sweitzer,* 347 Ill. 353.) Whether the uncollected taxes due these appropriations had been carried into the resources of the succeeding year does not appear. The length of time that delinquent and uncollected taxes have been outstanding or the probability of receipts from such uncollected taxes levied is not shown by the record. Taxes may be levied to pay delinquent liabilities. (*People* v. *New York Central Railroad Co.* 355 Ill. 80.)

The law presumes that the tax in question was legally levied, and the burden was upon the objector to show the invalidity of such tax. (*People* v. *New York Central Railroad Co. supra.*) The presumption is that a reasonable time had elapsed since the levying of prior taxes, and, sufficient taxes not having been collected to meet the liabilities, the county board had a lawful right to make a new levy to cover the deficits left by a prior tax levy. The county court did not err in overruling the objection to such item of the taxes.

Objection is made to the appropriation and tax levy of the county for the county hospital and Oak Forest institutions. On that subject the appropriation ordinance reads as follows: "For the purpose of providing general supplies (other than those specifically appropriated for under items of this appropriation) for the several buildings, departments and institutions of the county as specified, namely, * * * county hospital $400,000, Oak Forest institutions $300,000." It is urged that the purposes for which the funds are to be devoted are so indefinite and the objects for which the appropriations are made are so uncertain that the levy is void. The tax-payer's right to have specified the object for which a tax is levied is absolute. It is not, however, required that each item falling in the same class be specifically particularized. The demands of the law are answered if the item is stated by some general designation sufficient to give the tax-payer the information as to the purpose for which the tax was levied and to what particular uses the funds raised thereby will be devoted. (*People* v. *Illinois Central Railroad Co.* 271 Ill. 236; *People* v. *Bowman*, 253 id. 234.) The kinds and character of the different supplies used in a hospital are so varied and cover such a large range it would be impracticable to name each specific item. Such items may properly be embraced within the characterization of "general supplies."

Objection is made to the appropriation and levy for the county bureau of public works. The appropriation reads as follows: "For the relief of the indigent poor and for the relief of indigent and suffering soldiers, sailors, marines, and their families, as provided by the terms of an act known as the Bogardus law," etc. It is urged that this appropriation is for a double purpose. The county, by virtue of several statutes, has a duty to provide for the relief of "indigent persons." This term, as generally understood, covers those in need and requiring the assistance of charity generally. This fund for the general relief of the poor is disbursed under the supervision of a separate department and by separate administrative bodies which have no interrelation whatsoever with the soldiers, sailors and marines named in the Bogardus act. (Smith's Stat. 1929, chap. 23, pars. 154-154$i$.) The benefits of that act are limited to the assistance of war veterans and their families. Unfortunate individuals requiring assistance who were not soldiers, sailors or marines are not entitled to any benefits under the provisions of the Bogardus act. Such persons must look to the other statutes passed for the relief of the indigent, but there is nothing in the Bogardus act which prohibits a person entitled to benefits under that act from also obtaining benefits under the general statutes enacted for the relief of the poor and needy. Also it is apparent that the relief provided for those falling within the classifications named in the Bogardus act is not given as charity but is a recognition of an obligation owing to those falling within that act for services rendered in defense of the nation. It would hardly be claimed that a pension or a bonus to a veteran is a charitable donation, neither is the assistance provided to be furnished him or his family under the provisions of the Bogardus act to be classed as charity. The appropriation does not specify what amount or proportion of the fund appropriated, under which the tax levy is made, shall be devoted to those coming within the bene-

fits of the Bogardus act and those individuals falling within the general statutory provisions providing relief for the poor and indigent. The objection to this item of tax was well taken and should have been sustained.

Objection is made to the appropriation and levy of $1,050,000 for the hospital nursing fund. The appropriation and levy for that purpose read as follows:

"*Hospital nursing fund*—For the purpose of defraying necessary expenses for nursing services at the county general and psychopathic hospitals, provided that said expenditures shall be in accordance with the contract provisions entered into with the Cook County Hospital School of Nursing (board proceedings August 15, 1929, p. 1534); and provided further, that all expenditures shall be in accordance with the detailed budget submitted by the Cook County Hospital School of Nursing and as approved by the board of county commissioners; and provided further, that any changes in such services which involve expenditures in excess of those set forth in the said budget, shall only be made after presentation to and approval by the board of county commissioners."

The statute specifically provides for the making of contracts by the board of commissioners of Cook county for the care and treatment of the sick, poor and insane of the county. (Smith's Stat. 1931, chap. 34, par. 65.) The appropriation ordinance sets out that such contract has been made, and refers to the page wherein the contract may be found on the records of the board of commissioners. Such record is a public record subject to the inspection of any tax-payer of Cook county during business hours. If he desired information beyond that furnished by the appropriation ordinance he could readily get such information in detail from such record. This court has heretofore held that reference to an official manual of a department of a municipality may properly be made by the appropriation ordinance and the purpose of the appropriation sufficiently

designated in the ordinance by reference to such manual. (*People* v. *Arnold Bros.* 282 Ill. 305.) It would be impracticable to set out the contract between the board of commissioners and the Cook County Hospital School of Nursing and the detailed budget for such nursing purposes approved by the board of county commissioners. The requirements of the statute were satisfied by reference to the contract and budget made in the appropriation ordinances.

Objection was made in the objector's brief to the extension of the tax rate of .09 for the purpose of the Cook County Forest Preserve District. The objector in its reply brief states that this assignment of error is withdrawn.

It is urged that the county court erred in overruling the objections to the .01 tax levied for library building purposes and sites. The ordinance states on that subject: "For building purposes and purchase of buildings and sites and equipment for buildings." It was stipulated that no contract had been made for the purchase of sites or for the erection of any library buildings. It is argued that the appropriation is for four purposes: (1) For purchase of buildings; (2) purchase of sites; (3) equipment; and (4) building purposes, and that the tax-payer has the right to know the amount to be devoted to each purpose. Several cases are cited on which the objector relies as sustaining its view, but the case chiefly relied upon by it is *People* v. *Chicago and Alton Railway Co.* 289 Ill. 282. In that case the appropriation grouped into one item the amount necessary to erect buildings, install equipment, maintain and operate the buildings for one year and pay the salaries and fees of nurses and attendants. We do not regard that case as in point here. The statute which authorizes the city to build and equip a library particularly states that in cities of over 150,000 inhabitants a tax of one-tenth of one mill on the dollar may be levied annually "for the purchase of sites and buildings and for the construction and equipment of buildings, for library purposes." (Smith's

Stat. 1933, chap. 81, par. 1, pp. 1776, 1777; Cahill's Stat. 1933, p. 1753.) An additional tax of six-tenths of a mill on the dollar is provided to be levied for maintenance and operation of libraries. By the act but two classes of taxes may be levied: one for maintenance and operation, the other for the purchase of sites and buildings and for the construction of buildings and equipment therefor. The ordinance specified the objects for which the levy was made and the purposes for which the tax funds raised thereby were to be devoted in compliance with the terms of the statute and was sufficiently definite and specific. *Otis* v. *People,* 196 Ill. 542.

The objector attacks the levy of .01 levied for a working cash fund for the city of Chicago. This levy is contained only in the supplemental appropriation ordinance of July 29, 1930. The levy of .01 was in addition to the increase from $1.075 to $1.37 for the corporate funds. It was stipulated on the trial that the levy ordinance was passed July 29, 1930, levying a tax of .01 on each $100 for a working cash fund and extended for the year 1930. It was also stipulated that bonds for a working cash fund in the sum of $12,000,000 were issued and sold during the fiscal year 1930, and the requirements for one year's installment of principal and interest in the sums of $920,000 and $700,000, with an allowance for loss and cost, were included in the amount levied for the bond and interest fund for the fiscal year 1930 and such working cash fund bonds of $12,000,000. The issue presented is whether the city of Chicago could issue working cash fund bonds and levy in the year 1930 for an installment on the principal and the interest on such bonds, and, in addition to such bond and interest funds needs, levy a further tax of .01 to provide money for a working cash fund.

The authority of the city to create a working cash fund is derived from the act passed at the special session of 1930, (Smith's Stat. 1933, chap. 24, pars. 667a, 667f, p. 479;

Cahill's Stat. 1933, chap. 24, pars. 1012(1), 1012(6), p. 598.) The title of the act is, "An act to provide for the creation, setting apart, maintenance and administration of a working cash fund in cities having a population of 150,000 or more inhabitants." By that act cities having a population of 150,000 or more were authorized to create a fund to be known as a "working cash fund." The fund is to be created, set apart, maintained and administered as prescribed by the act for the purpose of enabling the city to have sufficient funds·at all times to meet the demands thereof for ordinary and necessary expenditures for corporate purposes. Section 2 of the act provides that the city may incur an indebtedness and issue bonds not exceeding the sum of $12,000,000, and that the city council shall, before the time of issuing the bonds, provide for the collection of a direct annual tax upon all the taxable property of the city sufficient to pay and discharge the principal of the bonds at maturity and the several interest installments as they fall due. Section 3 of the act grants to the city council the power to levy, annually, beginning with the year 1930, upon all the taxable property of ·the city, for the purpose of providing moneys for such fund, a tax not to exceed one-tenth of one per cent upon the taxable valuation for the year in which each such levy is made. Section 4 provides, in part, as follows: "All moneys received from the issuance of bonds as herein authorized, *or* from any tax levied pursuant to the authority granted by this act, shall be set apart in said working cash fund by the city treasurer and shall be used only for the purposes and in the manner hereinafter provided." It is further provided by the different subdivisions of the act that the moneys in the working cash fund shall not be regarded as current assets available for appropriation and shall not be appropriated by the city council in the annual appropriation bill, but shall be used in order to provide moneys with which to meet ordinary and necessary disbursements

for salaries and other corporate purposes; that such fund may be transferred in whole or in part to the general corporate fund of the city and so disbursed therefrom in anticipation of the collection of any taxes lawfully levied for general corporate purposes. Moneys so transferred to the general corporate fund shall be deemed to have been transferred in anticipation of the collection of that part of the taxes so levied which is in excess of the amount or amounts thereof required to pay any warrants, with interest thereon, theretofore and thereafter issued, and such taxes levied for general corporate purposes, when collected, shall be applied first to the payment of such warrants and the interest thereon and then to the reimbursement of the working cash fund. The act then goes into detail and prescribes the manner in which funds shall be handled. It is apparent that the purpose of the act is that this fund shall always constitute a working cash fund and shall never become impaired; that as advancements are made from time to time to other funds, such funds shall pay back to the working cash fund any such funds advanced by the working cash fund.

This court has repeatedly held that in determining the meaning of a grant of power to levy taxes strict construction will be given to that which is relied upon to confer the power, but the construction will be liberal in all that tends to protect the tax-payer. (*People* v. *Central Illinois Public Service Co.* 328 Ill. 440; *Peoria and Pekin Union Railway Co.* v. *People,* 198 id. 318; *People* v. *Chicago and Eastern Illinois Railroad Co.* 314 id. 596; *People* v. *Wabash Railway Co.* 349 id. 93; *Town of Drummer* v. *Cox,* 165 id. 648.) Here, an examination of the title of the act discloses that it makes provision for the creation of a "working cash fund." The term "working cash fund" is in the singular and not in the plural. Section 4 provides that "all moneys received from the issuance of bonds as herein authorized, or from any tax levied pursuant

to the authority granted by this act," etc. Thus two concurrent methods are provided, but they are disjunctive ones. The fund may be raised either by the issuance of bonds or by the levy of a direct annual tax, or both, but bonds can not be issued in excess of $12,000,000.

The question at issue, therefore, is, Did the legislature by the terms of section 2 of the act intend to provide by means of a bond issue for the raising of funds not to exceed $12,000,000 and not concurrently therewith, but, in addition thereto, by section 3 of the act intend to provide through an annual tax levy a means of raising additional moneys for the working cash fund, or was it the intent by section 3 merely to provide an alternative means for creating the fund in the event such fund was not raised by a bond issue? If the intent of the legislature may be gathered from the terms of the act it must be given effect, and the rule accepted by all authorities is that the language of an act granting the authority to tax shall be strictly construed in favor of the tax-payer. (*People* v. *Central Illinois Public Service Co. supra.*) Section 2 limits the fund to be raised by a bond issue to $12,000,000. Section 4 of the act makes the reimbursement of the funds taken from the working cash fund mandatory. It is obvious that the legislative intent was that the working cash fund should never be lost or dissipated but always should be available for temporary or emergency current needs. Section 5 requires the city council, in the passage of any ordinance authorizing the transfer of any money out of the fund, to set forth therein the taxes in anticipation of the collection of which such transfer is to be made and from which the working cash fund is to be re-paid in order to keep the fund unimpaired. It is without question that this working cash fund shall be set apart, maintained and used only for ordinary and necessary expenditures for corporate purposes. The legislative intent is apparent that it deemed the sum of $12,000,000 a maximum amount for a working cash

fund, and it proceeded to surround the fund with every safeguard for keeping it intact and limited the amount which could be raised through a bond issue to the sum of $12,000,000. If the legislature intended by section 3 to give the city council the right to raise an additional one-tenth of one per cent per $100 valuation by an annual tax levy, it is conceivable that in the course of time the amount of the working cash fund could be multiplied many times over the original $12,000,000 raised by the bond issue.

The word "or" in section 4 must be given some meaning. Having in view that two methods are created for the raising of a working cash fund, the preposition "or" must be given its usual disjunctive meaning. It does not have the meaning of the word "and" in section 4. That section is intended to provide that where the method for raising the working cash fund is by issuance of bonds or by levying a direct annual tax of one-tenth of one cent upon the valuation, such fund shall be set apart as a working cash fund and used for no other purpose. We are of the opinion that it was not contemplated that any city should be granted the power to raise the maximum working cash fund by issuing the bonds of the city to the maximum amount of $12,000,000 and in addition thereto be empowered to levy a separate, independent tax for the purpose of raising additional funds for such fund. The city is limited to $12,000,000 for a working cash fund. Where the city desires to create a working cash fund of the maximum amount and issue bonds to that amount, it has not the right under the statute, in addition to the issuance of bonds in the maximum amount, to also provide for a direct annual tax levy under section 3 of the act for the purpose of raising funds to be added to the working cash fund. The county court was in error in holding valid the levy of one-tenth of one per cent for a working cash fund for the city.

For the reason herein given, the judgment of the county court is affirmed in part and reversed in part, and the cause is remanded for further proceedings in harmony with the findings herein expressed.

*Affirmed in part; reversed in part and remanded, with directions.*